UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No.  1:13-cr-75 |
| | ) | |
| DAWN LEE HAMILTON, | ) | Sentencing Date:  June 28, 2913 |
| | ) | The Honorable T.S. Ellis, III |
| Defendant. | ) | |

## <u>DAWN HAMILTON'S MEMORANDUM IN AID OF SENTENCING</u>

Dawn Hamilton has entered a plea of guilty to one count of Major Government Fraud, in violation of 18 U.S.C. §§ 1031 & 2.  Her actions giving rise to this offense, although very serious, were in a sense a tragic but somewhat predictable outcome for a survivor of domestic violence, with a long history of being emotionally and physically abused by her step-father and a long history of alcohol and drug abuse.  Having been sober since September 2007, Ms. Hamilton considers herself first, a mother, but also a recovering addict and sponsor of others, many of whose lives she undoubtedly has helped save.

Attached to this Memorandum are 28 letters addressed to the Court who know Ms. Hamilton well and have seen the manner in which she survived violent and controlling relationships, has focused on maintaining sobriety, sheltering her daughters from her injuries and her drug and alcohol abuse and meeting their needs, and how she has inspired others by her actions and emotional discipline, putting the needs of others ahead of her own. The letters also portray how Ms. Hamilton has mentored others who struggle with addiction and helped them walk path back to sobriety.  Importantly, the letters demonstrate an overall responsibility in personal and business, providing the fuller context in which this Court should view Ms. Hamilton's actions.  For these reasons and reasons more fully discussed below, this Court should

sentence Ms. Hamilton to a term of imprisonment of 24 to 30 months in addition to the agreed-upon forfeiture amount of $1,232,145.94.  In so doing, this Court will fulfill its sentencing obligations pursuant to Title 18 U.S.C. Section 3553(a) by imposing a sentence that is not "greater than necessary" to comply with the statutory goals of sentencing, including the need to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public from any further crimes by the defendant, and provide the defendant with any necessary treatment. 18 U.S.C. § 3553(a)(2).

**LEGAL FRAMEWORK**

Since the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), district courts are required to give "respectful consideration" to both the guidelines and the factors contained in 18 U.S.C. § 3553(a) when determining an appropriate sentence.  Section 3553(a) requires the Court to impose a sentence that is "sufficient but not greater than necessary" to satisfy the statutory goals of sentencing after making an "individualized assessment based on the facts presented."  *Gall v. United States*, 552 U.S. 38, 49-50 (2008); *Rita v. United States*, 551 U.S. 338, 351 (2007).  The Court must begin its analysis by correctly calculating the advisory sentencing guideline range, but it is then free, in light of the other statutory sentencing factors, to impose an entirely different sentence - one which is "sufficient, but not greater than necessary to comply with" the goals of sentencing.  *See Rita,* 551 U.S. at 350-51.  In order to do so, the Court is directed to consider various specific factors, set out in §§ 3553(a)(1) and (a)(3)-(7), including the nature and circumstances of the offense, the defendant's characteristics, the kinds of sentences available, the sentence called for under the Sentencing Guidelines, the need to avoid unwarranted disparity among similar defendants, and the need to provide restitution to any victims.

## I.     MS. HAMILTON'S HISTORY AND CHARACTERISTICS – § 3553(a)(1)

Section 3553(a)(1) requires the Court to consider "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).

### A.     Personal History and Characteristics of the Defendant

Ms. Hamilton overcame a difficult childhood that offered her no encouragement.  Her step-father was physically and emotionally abusive towards her as a child.  Her brother whom she tried to protect from neighborhood bullies who physically and sexually abused him, laments that those bullies sometimes included their parents.

> As children, our father faced many challenges that weighed heavily on him, a weight that created a burden that he often attempted to relieve by taking his frustrations out on my sister and me.  Our father, who was a California Highway Patrol Officer, acted with impunity, and would handcuff Dawn, or starve us until we would submit to his will, always in an attempt to break us down and communicate that he was the ultimate authority in his home.

Letter from John Hertogs, Exhibit 2 at 13.

Greg Thomas, the father of Ms. Hamilton's two children, observed similar cruelties by her step-father later in her life.

> Not only am I aware that Dawn's father was very abusive toward her as a child, but I have always been shocked by stories her siblings have told about growing up. Her brother and sisters have told me stories of him handcuffing her to the cabinets and forcing her to finish her dinner, choking her and throwing her down the back steps, locking her outside for the night for being late, beating them with a strap, and leaving them on the side of the road during vacations for different reasons (wanting to stop at a comic book store and asking for a soda that sort of thing).

> All families have their issues, and mine certainly has its, but I have witnessed first-hand her father's ability to be extremely cruel and inappropriate. When our first daughter was born her parents came to visit. All her father could do was make comments about how large Dawn's breasts were. He constantly took pictures when she was breast feeding and I recall thinking how inappropriate his comments were.

> When we went to visit Dawn's parents the next summer our daughter Megan was around 1 year old.  First Dawn's father greeted her by stating that she had gotten fat as soon as we got to the house, no hello how are you, nothing just "you got fat".  I remember being surprised because we literally had just gotten out of the car and that was the way her greeted his daughter after just having had a baby. Not to mention he is a huge man of 6'8" and well over 300 lbs.

Letter from Gary Thomas, Exhibit 2 at 7-8.

Mr. Thomas continued with his observations.

> It is pretty obvious that Dawn was raised in an abusive situation. Because of that, she has also been in a series of abusive relationships. After we broke up she married a man named Mark Grillo. I recall her coming to pick up the girls one day and having sunglasses on. It was clear something was wrong. Her lip was swollen. We started talking and she broke down and told me it wasn't working between them. She took off her glasses to reveal a badly blackened eye. After Dawn divorced Mark she married Barry. He was also abusive, although in a different way.  He was a drug addict an adulterer and a member of a biker club. I believe she stayed with him for ten years out of concern for his daughter who lived with them.

> It was while she was with Mark that she started working for Keith Hedman. I never met Keith, but I know Dawn and she was not one to stand up to men, myself included. In my experience she will do whatever it takes to avoid confrontation and to keep the peace. I can easily see how between her abusive up bringing and history with abusive men she would be very easy to manipulate and bully.

Letter from Greg Thomas, Exhibit 2 at 8.

> Ms. Hamilton's brother also described how years of abuse may have prevented

her from standing up to Mr. Hedman.

> Dawn moved to the Washington D.C. area, where she eventually met and married a marine named Mark. Mark was also physically violent and emotionally abusive, and on many occasions Dawn and I would talk on the phone about her situation, one that she wanted to escape from, but couldn't. Years and years of non-stop abuse had worn her down, and my once fierce sister had lost her will to fight back. I honestly feared for my sister's life.

> It's my understanding that this abuse would have continued indefinitely if it had not been for the intervention of two men Dawn worked with, Keith Hedman and Joe Richards. These two men, who were former marines, assisted Dawn with her separation from Mark.  This was the kind of assistance that Dawn rarely received

from other men in her life and the kind of assistance that could create a tremendous sense of loyalty.

This blind sense of loyalty to Keith and Joe lasted for some time, and was possibly fueled by Dawn's drug use as well as acts of deception and manipulation on Keith and Joe's part. Eventually I think Dawn may have realized that these men were not who she thought they were. But years of physical and emotional abuse can take its toll on a person, and I believe she was too afraid to discuss her problems with me, or to outright object to any of her concerns.

Letter from John Hertogs, Exhibit 2 at 13-14.

Others have made similar observations.

Dawn has a long history of being abused and manipulated by men, beginning in childhood. Her stepfather was physically and verbally abusive to her and threw her out of the house when she was 16. Over the past 20 years she has had 3 significant relationships. All have been either physically, mentally or sexually abusive, or all three. The men with whom she was involved were often controlling and would isolate her from her friends, so she became dependent on them. This resulted in low self-esteem and the belief that her own needs and values were subordinate to those of others. She expected men to mistreat her and did not see herself as valuable and worthy of being cared for and respected by men. Her sense of self-worth was largely dependent on approval from men, and she subjected herself to their control and manipulation. Over the years I witnessed a deterioration in her self-image and involvement in abusive relationships. She abused substances, I believe in an effort to cope with her emotional pain. It is my opinion that her business partner, Keith Hedman, exploited her during this time for his own personal gain.

Letter from Cheryl Berger, Exhibit 2 at 11.

Ms. Hamilton was eventually diagnosed with Post-Traumatic Stress Disorder, Depression and Anxiety. Her therapist opined that having endured many years of extreme physical and emotional abuse, she used abuse survival techniques to avoid setting limits or necessary confrontation in relationships. See Letter from Beth Chaney, MS, LCPC, Exhibit 2 at 1.

In October 2010 and February 2011, after three years of sobriety, Mr. Thomas, the father of her two children, illegally removed them from her care taking them across state lines. As described by Ms. Chaney:

5

In 2011 he took them out of state against a court order. He hid in the basement of his "friends" home, a chronically incarcerated drug abuser, withheld Ms. Hamilton's daughters from her, and refused to administer medical care to them. He attempted to extort money from Ms, Hamilton during this period. Ms. Hamilton hired an attorney and eventually, in December of 2011, obtained full legal custody of her daughter that was and is still a minor. The process took over a year, involved several court dates, therapy visits, doctor visits, and was tremendously stressful for Ms. Hamilton and her children. To say Ms. Hamilton was distraught and consumed with worry for her children during this time would be a gross understatement. It is my observation that Ms. Hamilton felt her concerns at work would have to take a back seat until her children were again safe.

Letter from Beth Chaney, MS, LCPC, Exhibit 2 at 3.

Another friend of over 15 years has witnessed the same dedication to her children.

I have witness the caring and loving mother that she has been to her two daughters, Megan and Lindsey. I have witnessed firsthand the early mornings of getting up well before dawn each school day to drive an hour to pick up her daughters to make sure they had a way to get to school and were dressed and fed properly. Although both girls have a father, Dawn has always been the provider and caregiver for her children.

Letter from Wesley Severson, Exhibit 2 at 15.

Friends and colleagues have also witnessed Ms. Hamilton retake control over her business affairs and have seen how through SAC she has improved the lives of many people, providing them with jobs and employment opportunities they might not have thought possible.

SAC's Chief Operating Officer has observed first hand the professionalism Ms. Hamilton demonstrated after SAC was raided by federal agents in February 2012.

Despite the pressure of uncertainty that Ms. Hamilton faced she continued to persevere and manage the personnel under her direction. When others would panic in fear of uncertainty, Ms. Hamilton's constant reassurance and professional direction was and is remarkable under the circumstances.

Letter from Frank J. Polievka, Sr., Exhibit 2 at 18.

Mr. Polievka went on to state:

6

I have never been more inspired by the actions and emotional discipline than what I have witnessed by Ms. Hamilton. Her ability to maintain a professional environment and continually provide positive direction and reinforcement to her staff and family is remarkable. Ms. Hamilton puts the needs of others first and foremost despite her own needs. Her commitment to do the right thing has inspired myself and many others and is considered a keystone in my life.

Exhibit 2 at 18-19.

One of Ms. Hamilton's former employees, now Assistant HR Manager at USIS, describes how Ms. Hamilton supported SAC's employees in improving their skills and their lives.

As an employer Dawn ensured that her employees were treated with respect and SAC would provide a balanced work life employment opportunity. Employees experienced health insurance paid for by the company, flexible personal time off, flexible work schedules, 401(k) employer match, and training/educational opportunities for those who expressed interest in advancing knowledge in their career field. All these programs she approved and didn't think for a second to reject or add additional hardship to employees' financials. She provided bonuses and increases on an annual basis to ensure employees were not feeling the burden of a downed economy.

Letter from Kanton Wooten, Exhibit 2 at 20.

Those who are members of her Recovery Community tell a similar story, confident that without her support, many of the women she has helped would not be sober.

Dawn has also become an integral guide to others in their spiritual development. She is relied upon by many women in her network; sets a glorious example of how to live life on life's terms, with grace and dignity; and is a vital part of a recovering community. Her service work to the community is far-reaching. She speaks at institutions, participates in assemblies and conventions, and attends group business meetings in a significant capacity for the formulation of ways to better serve others, particularly those who are suffering. Dawn carries a message of love and hope to those who need it, and as is the case with her daughters; we need her, and she needs us.

Dawn is a kind and loving woman. Her devotion is towards God, family, and helping others. People flock to her because she is so free-spirited, an inspiration, and an absolute joy to be around. I can think of no better example of someone that would do whatever it takes, whenever necessary, to help another human being with their problems, big or small. Dawn is one of kind, and so very blessed with the ability to forgive and selflessly consider the interest of others. She has an uncanny ability to accept life on life's terms; faithfully and confidently face

7

challenges that are placed before her; and carry herself with humility, modesty, serenity, and warmth. Grace becomes her.

Letter from John Gearheart, Exhibit 2 at 37.

These words have been echoed by many women.

I met Dawn about four years ago when I asked her to sponsor me and help guide me through the twelve steps of AA (Alcoholics Anonymous). I had been using drugs and alcohol since the age of twelve and I am now forty six years old. I did not know any other way of life until being introduced to AA. Dawn has given me hours and hours of her personal time to listen to me cry, talk about my shame and guilt and worked with showing me by praying, taking me to various sober functions and spending a lot of personal time sharing her experiences and giving me suggestions to start my sober journey.

I have in the past gone in and out of AA. I would be sober for four months and then I would go back to using drugs and alcohol.  This happened for several years and I even relapsed twice while Dawn was my sponsor. Dawn never left mv side. She would periodically call and text me to try and reach out to me and I believe it saved my life.  The minute I felt complete despair and hopelessness I would reach out to her and she would drop everything to be by my side. She would take me to meetings, spend time with me and just show love for me. The last relapse I had she came to the hospital and sat with me for hours on end and visited me almost every day to ensure I knew she loved and supported me and my recovery. I was in the hospital for twelve days. When I got out of the hospital, she was right there for me still.  I have never had anyone show me the love, support and giving of their personal tithe towards helping me stay sober as Dawn has done. I now have almost two years clean and sober and to reiterate I could not put together more than four months. I speak with my sponsor Dawn everyday still and she is an essential part of my recovery. She has shown me through her own struggles that I can make it through anything with prayers, the twelve step program of AA and my fellow AA support group. I do not have to use for any reason ever and that there is hope for me as well as others suffering from this debilitating disease.

Dawn has given more of herself to help women suffering through the disease of alcoholism than most.  Her dedication to helping people and giving of her time to show other women and give hope for a new way of life is unprecedented.

Letter from sponsee, Exhibit 2 at 27-28.

Ms. Hamilton's friend and the Senior Case Manager at the Bull Run ASAP Program has also witnessed her work with women trying to get sober.

Dawn has been sober for over 5 years; she works with her own AA sponsor and is a sponsor to several women.  She works with these women daily as a guide through the steps of AA and is an outstanding example of how a program of recovery from addiction works. Dawn's contributions to AA and women in recovery are priceless and necessary. I am certain that without her presence and participation in her local AA community, the many women she has helped would have suffered much longer in their addiction or perhaps not have found recovery at all. She has a special talent for connecting with other women and holding a space for healing. I personally rely on Dawn's ability to ground the principals of AA and share how to live in these principals daily through her faith in God and service work. She is one of the most authentic women I know and our community will suffer a great loss if she can no longer be with us on our journey.

Letter from Stephanie Holobor Carpio, Exhibit 2 at 35.

With sobriety, Ms. Hamilton has retaken control of her life, encouraging others to be accountable for their personal actions and sobriety, and working hard to provide emotional and financial stability for her children.

Her eldest daughter Megan "cannot imagine where I would be right now if I did not have her."  She cannot think of any person in the world "who is as kind, generous and strong as her mother."  Exhibit 2 at 9-10.

Ms. Hamilton's 17 year old daughter Lindsey describes how Ms. Hamilton has taught her about charity and helping others in need, and recounts how Ms. Hamilton helped her recover from her relationship with her emotionally abusive father.

A few years ago I wasn't doing very good in school and I never thought I'd go anywhere. My father had taken me and my sister out of the school we had attended for several years and enrolled us in a school by his house in a bad neighborhood when my mom was out of town visiting her father. He then took us out of state to live with a friend of his who is a crack addict, kept us in his basement, and did not let us see her. After about a month, when I could, I reached out for my mom and she came for me. She showed me to push back hard when someone does something to your children. She got an attorney and fought my father for over a year, keeping me safely with her, and finally winning full legal custody. I had been through quite a lot during that year between my parents, but my mother was there for me. She went to therapy with me every week, took me to the doctor regularly because I was very sick when she came for me (I had strep throat and my father had refused to give me my ADHD and depression

9

medication which with everything going on made me suicidal) and got me back on track with school. I had always wanted to work with children as an attorney. My mom told me I could do it, she pushed me to work hard at school, be successful, and got me to beat the point where I am now. She is the reason I go to the school I'm currently in. It is a special school where you have to qualify to get in, keep your grades up, and have no behavior issues. I never thought I'd make it but she pushed me and never gave up.

Letter from Lindsey Thomas, Exhibit 2 at 6.

From these letters, it is clear that Ms. Hamilton will not give up even as she is resigned to her impending incarceration. She makes no excuses for her involvement, making her sole focus how she can minimize its impact on her family and the communities she has touched. As one friend so aptly said, "she provides a fine example of change through adversity, and I am certain that regardless of the outcome of her sentencing, she will be able to use the experience for the benefit of others in the future." Letter from Paul A. Hodder, Exhibit 2 at 26.

### B.    Acceptance of Responsibility and Substantial Assistance

It also is appropriate in assessing Ms. Hamilton's history and characteristics to consider her cooperation, post-discovery conduct, and substantial assistance to the Government.[1] First, as evidenced by the Plea Agreement and the 23-page Statement of Facts, Ms. Hamilton has cooperated with the Government and has abided by the terms of that Plea Agreement. Within a matter of days after the search warrants were executed, Ms. Hamilton was fully debriefed by the Government and provided information that substantially assisted in the prosecution of others including David Lux, Joseph Richards, Keith Hedman and Derek Matthews, all of whom signed plea agreements after being informed that Ms. Hamilton had agreed to pled guilty. Ms. Hamilton also immediately took steps to terminate any control Mr.

---

[1] The Government has recommended a two level reduction in Ms. Hamilton's offense level for her substantial assistance pursuant to § 5K1.1.

Hedman and the other Company A employees had over SAC's business and financial operations. She did so following discussions with the prosecution during which she was told that the government did not intend to criminally prosecute SAC and did want to see SAC's innocent employees lose their jobs.  Over the past 17 months, Ms. Hamilton has operated SAC successfully without any outside interference or involvement.   In 2012, SAC had revenues of $11,768,362.  See Exhibit 3.

Now that the Forfeiture Order has been entered, Ms. Hamilton is prepared to pay the full $1,232,145.94 she agreed to forfeit – an amount that represents the total of salary and distributions Ms. Hamilton was paid over the course of the conspiracy.

As noted in her Objections to the PSR, the United States has advised Ms. Hamilton that it intends to seek an additional criminal forfeiture from SAC.  Ms. Hamilton and the Government are attempting to reach agreement on an additional amount which Ms. Hamilton would agree to forfeit in lieu of the Government filing a criminal indictment against SAC.  The Civil Division of the U.S. Attorney's Office has also notified Ms. Hamilton that it intends pursue a claim against her individually under the False Claims Act seeking additional monetary penalties and treble damages for losses based on $31 million in total contract payments.

Ms. Hamilton has offered to resolve these speculative liabilities by paying an additional $1.2 million to the Government out profits SAC has earned and anticipates earning during the remainder of 2013 on 8(a) and small business contracts and task orders that were awarded to SAC in 2012 and 2013, after the fraud was disclosed, precluding any claim by the Government

that Ms. Hamilton's false statements to the SBA influenced agency action as to these contract payments.[2]

The Court should consider these actions as part of Ms. Hamilton's history and characteristics in addition to the letters describing her life as a whole.

## II.      NATURE AND CIRCUMSTANCES OF THE OFFENSE – § 3553(a)(1)

The Statement of Facts and the PSR describe in detail the offense and Ms. Hamilton's role in it.  However, pursuant to § 3553(a)(1), it is important for the Court to consider the full context in which her crime occurred.  Ms. Hamilton pled guilty to Major Government Fraud because, over the course of SAC's existence, she permitted Keith Hedman and others at Company A to exercise impermissible control over her personally and over SAC's operations and finances.  While not offered as an excuse for her illegal conduct, the nature and circumstances of the offense help to explain, and to some degree mitigate, the gravity of Ms. Hamilton's actions.

Most importantly, this offense does not involve any pecuniary harm to the U.S. Government.  Every contract was performed and, and in most instances, performed in an exemplary manner.  Simply put, the Government received all services that it paid for.  Indeed, in its Sentencing Memorandum for David Lux, the Government stated:

> To be sure, the United States acknowledges that there is no evidence in the record showing that Company B [SAC] performed any work that was unsatisfactory in quality or below the standards required in the contracts awarded to it. In fact, there is undisputed evidence to suggest that many of the government agencies praised that work.

---

[2] Liability under the False Claims Act is subject to the judicially-imposed, requirement that the false statement or claim be material.[7] Materiality depends on "whether the false statement has a natural tendency to influence agency action or is capable of influencing agency action." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785 (4th Cir. 1999) (quoting *United States v. Norris,* 749 F.2d 1116, 1122 (4th Cir.1984)).

*United States' Sentencing Position at 7-8, United States v. Lux*, No. 13-cr-70, Dkt. No. 17(E.D. Va., June 7, 2013); see, e.g., Exhibit 10 (two sample Contractor Performance Assessment Reports for SAC with primarily "exceptional" ratings). Thus, at no point during this period did it appear that the Government was being defrauded, because the Government received superior services and full value for the money it paid to SAC.

Second, Dawn Hamilton does qualify as a socially and economically disadvantaged individual under applicable SBA rules and regulations. The Government does not dispute this fact. As the past 17 months have proven, Ms. Hamilton owns SAC and has operated SAC without any outside interference or involvement. In 2012, SAC had revenues of $11,768,362. See Exhibit 3. After the fraud was disclosed, SAC continued performing on many of its existing contracts and, in fact, was awarded new 8(a) and small business contracts and task orders by the same government agencies the prosecution claims she defrauded. Exhibit 3 is a spreadsheet that lists nine such contracts. Thus, the programmatic goals of the SBA's 8(a) program were achieved here to some extent. This socially and economically disadvantaged individual acquired the skills necessary to run this business.[3] Moreover, as the "victim impact letter" submitted by the SBA states: "small business contracting is a top priority to the Federal government due to the tremendous opportunity for growth and job creation which federal contracts provide for small businesses." K. Dodds letter at 2. SAC did create jobs and growth, going from no revenue in 2003 to more than $11 million in 2012, and employing approximately 154 people.

---

[3] The past 17 months also refute the Government's theory that SAC has always been a sham corporation. Had that been so, then Ms. Hamilton could not have successfully operated it this past year and one-half.

Third, the assistance SAC received from Mr. Hedman and Company A was not dissimilar to the forms of assistance that are available to small 8(a) companies under the SBA's Mentor/Protégé Program where Mentors are permitted to provide the following forms of assistance to Proteges:

- Technical and management assistance;

- Financial assistance, including equity investments and/or loans;

- Subcontracting support; and

- Assistance in performing prime contracts through joint venture arrangements.

See 13 CFR 124.520.  Under the program, joint ventures between large businesses and 8(a) participants are excluded from the affiliation rules that would otherwise disqualify them from receiving federal contracts set aside for the 8(a) Program.  These are the rules Ms. Hamilton violated.  In fact, two separate Federal Agencies approved of a Mentor-Protégé relationship between Company A and SAC.  On May 9, 2011, the Federal Aviation Administration ("FAA") approved a Mentor-Protégé Agreement between Company A and SAC.  See Exhibit 5. According to that Agreement:

> The FAA Small Business Development Program Group (SBDPG) Mentor Protégé Program provides a mechanism whereby the Mentor can enter into a relationship with a Small Business (SB) firm to provide technical and/or management assistance; financial assistance in the form o[f] equity investments and/or loans; subcontractors; and/or assistance in performing prime contracts with the U.S. Government in the form of joint venture or teaming arrangements.

*Id*. at 1.  The Department of Energy also approved a Mentoring Agreement for Company A with SAC on April 25, 2011.  See Exhibit 6.  According to this agreement, Company A was to provide to SAC "business and technical assistance" including "Training support," "Development of expertise capabilities," "Development in procurement and logistic areas," and "Business

program enhancement." *Id.*[4]   Thus, there was at least a framework to justify the close

relationship between the two businesses.  Within that context, given Mr. Hedman's success with

Company A and Ms. Hamilton's personal circumstances, it is not surprising that Ms. Hamilton

relied heavily on Mr. Hedman's advice and guidance, but also that she abided by his rules and

did what he said she should do.

Furthermore, as the PSR pointed out, fraud and abuse in the SBA's 8(a) program were

"widespread and openly-known."  See Report to Chairwoman, Committee on Small Business,

House of Representative:  *8(a) Program: Fourteen Ineligible Firms Received $325 Million in*

*Sole-Source and Set-Aside Contracts*, GAO-10-425, March 2010, Viewable at

http://www.gao.gov/products/GAO-10-425.  The Report found that controls over the 8(a) set-

aside program were not adequate to ensure that only eligible 8(a) companies obtained set-aside

and sole source contracts.  This occurred because the SBA did not require an adequate

verification process allowing nonqualified companies such as SAC to receive awards.  *Id*. at 29-

37  Moreover, as the GAO found, "SBA staff responsible for annually assessing firm eligibility

allowed firms to remain in the 8(a) program and receive contracts despite clear evidence

provided by company officials during annual reviews that showed they were no longer eligible."

*Id*. at 8, 33-35.  In fact, in a number of instances, GAO staff brought eligibility violations to the

attention of the relevant specialist in SBA's district office.  According to the Report, "[i]n none

of these instances did the agency take any action to remove these firms from the program, even

after acknowledging to our staff that the issues we raised ought to be 'red flags' or cause for

termination from the program."  *Id*. at 35.

---

[4] Company A and SAC did apply to the SBA to have a Mentor-Protégé relationship, but the SBA
rejected that request.

While the SBA's management failures do not in any way excuse Ms. Hamilton's conduct, a sentence that provides adequate deterrence and promotes respect for the law must recognize that the SBA bares some measure of responsibility for tolerating, if not encouraging, fraud and abuse in the 8(a) Program.

## III.   AVAILABLE SENTENCES – § 3553(a)(3)

Section 3553(a)(3) directs the court to consider "the kinds of sentences available." 18 U.S.C. § 3553(a)(3). In this case, the entire range of sentences, from probation through incarceration is available to the Court. See 18 U.S.C. § 3561(a)(1).  Nor, is the Court bound by the sentencing guideline range in this case.

## IV.   SENTENCING GUIDELINES – § 3553(a)(4)

The Court must also take the sentencing guidelines into consideration.  As a result of the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220, 226-27 (2005), the federal sentencing guidelines are no longer mandatory, but are only advisory. The guidelines are "not only not mandatory on sentencing courts; they are also not to be presumed reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009) (emphasis in original); see also *Gall v. United States*, 552 U.S. 38, 50 (2007) (stating that judges "may not presume that the guidelines range is reasonable" in considering how the statutory factors apply to an individual defendant); *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (noting that sentencing courts may vary from the advisory guidelines based solely on policy considerations, including disagreement with the policy considerations underlying the guidelines in a case). In other words, the advisory guidelines are only "the starting point and the initial benchmark" in determining a sentence. *Gall*, 552 U.S. at 49. Sentencing judges "must make an individualized assessment based on the facts presented." *Id*. at 50.

The guideline calculations in this case are driven almost entirely by the loss table in USSG § 2B1.1 – under the PSR, a +20 levels.  This Court should reject that loss amount as a proper measure of the harm caused by Ms. Hamilton's offense for a number of reasons.  First, § 2B1.1 does not reflect past practice, nor has it been revised by the Commission to capture the nation's experience with fraud cases in the years since the guidelines were adopted.  In fact § 2B1.1 routinely receives less deference from courts nationwide regardless of the offense of conviction. See Exhibit 7 (illustrating the dramatic increase in the rate of non-government-sponsored below guidelines sentences under § 2B1.1 since fiscal year 2006).  Moreover, § 2B1.1 leads all major offense categories for such below guidelines sentences (which are the result of either departures, variances or both), and is approaching 25% of all downward departure sentences. See Exhibit 8 (illustrating sentencing trends under § 2B1.1). Courts now are sentencing within the § 2B1.1 guideline range a bare majority of the time.  *Id.*  Further, when courts sentence below the Guideline range in fraud offenses, the median percentage decrease has consistently exceeded 50% since 2006. See Exhibit 9 (illustrating median decreases from guideline minimums).

### A.      Section 2B1.1 Is Not Based On Empirical Data Or National Experience.

Section 2B1.1 is not based on "empirical data and national experience," allowing this Court freedom to conclude that the guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." *Kimbrough,* 552 U.S. at 109-10. Instead, the average sentence imposed under § 2B1.1 post Booker has been below the low-end of the average applicable guideline range.[5]  Because § 2B1.1 does not reflect pre-guidelines

---

[5] See U.S. Sentencing Comm'n, Fifteen Years of Guidelines Sentencing, at 56 (2004), available at http://www.ussc.gov/Research/Research_Projects/Miscellaneous/15_Year_Study/index.cfm.

sentencing practices or judicial decision-making, sentencing data, and criminological research during the guidelines era, there is no reason to assume that the advisory guidelines range in this case captures § 3553(a)'s considerations.

Additionally, the primary offense of conviction, 18 U.S.C. § 1031, is a rarely prosecuted offense. According to U.S. Sentencing Commission data, from fiscal year 2008 through 2012, nationwide there have been a total of just eight sentencings for Major Government Fraud out of a total of over 400,000 federal sentencings.  See U.S. Sentencing Comm'n, 2008-2012 Datafile, USSCFY08-12.  As a result, there is simply no "heartland" for such offenses, therefore the application of § 2B1.1 should be given little, if any, weight.

### B. A Guideline Sentence Substantially Overstates The Seriousness Of The Offense In This Case.

 "The [Sentencing] Commission has determined that, ordinarily, the sentences of defendants convicted of federal offenses should reflect the nature and magnitude of the loss caused or intended by their crimes." § 2B1.1 *background cmt*. "[M]ost fraud statutes [falling under § 2B1.1] cover a broad range of conduct with extreme variation in severity." *Id*.

As relevant here, a sentence substantially below the guidelines is appropriate where the Government has not suffered any actual pecuniary harm due to the full performance of the contracts at issue. In this case, the loss amount – attributed to the value of benefits diverted – substantially overstates the seriousness of the offense.

### 1. This Case Involves No Pecuniary Harm to the Government.

There is no dispute that SAC performed all of the contracts that it was awarded. In fact, once SAC won a contract, it received extensions due to its high level of performance.  As the Government admits, "there is undisputed evidence to suggest that many of the government

agencies praised [SAC's] work." United States' Sentencing Position, at 7-8, filed in *United States v. Lux*, No. 1:130cr-70, Dkt. No. 17.

Despite the lack of pecuniary harm to the government, the guideline increases Ms. Hamilton's total offense level by 18 or 20 levels.  This increase accounts for most of the recommended sentencing range.  In a government contracts case in which there was no loss, Ms. Hamilton's  advisory guideline range would be level 8, or 0-6 months (base offense level (6), plus sophisticated means (+2), plus role as organizer and leader (+2), minus acceptance of responsibility (-2)).  A sentence of 24 to 30 months amply takes into account the programmatic harm Ms. Hamilton 's conduct caused to the SBA and to otherwise qualified 8(a) companies who did not received these contracts.

As the Seventh Circuit said, "it is necessary to distinguish between two types of fraud." *Schneider*, 930 F.2d at 558. The first type of fraud is where the offender does not perform his promise with the intent to "pocket the entire contract price without rendering any service in return." *Id.* at 558.  "The other type of fraud is committed in order to obtain a contract that the defendant might otherwise not obtain, but he means to perform the contract (and is able to do so) and to pocket, as the profit from the fraud, only the difference between the contract price and his costs." *Schneider*, 930 F.2d at 558; see also *United States v. Chatterji,* 46 F.3d 1336, 1341 (4th Cir. 1995) (finding no actual or intended loss existed to consumers because the defendant's products "were exactly what they purported to be" in spite of his false statements to the FDA in support of a drug approval process).  Ms. Hamilton can properly be categorized as committing the second type of fraud.

Even the value of benefits in this case – here, SAC's profits – overstates the seriousness of the offense when similar cases involving non set-aside contracts would involve no actual or

intended losses. See *United States v. Miller*, 588 F.3d 560, 567 (8th Cir. 2009) (rejecting the government's argument that the offense level should be determined based on the defendant's gain holding that gain is a permissible alternative "only if there is a loss but it reasonably cannot be determined"); see also *Sublett*, 124 F.3d at 695 (stating that the defendant's "conduct falls into the latter category [of fraudulent conduct] and he should not be characterized as causing as much loss as one who intends to totally cheat the victim, giving nothing in return"); see *Schneider*, 930 F.2d at 558-59 (finding the Government's loss calculation argument "irrational[ because] it would mean that the [defendants] would (other things being equal) be punished as severely as a con artist who intended to winkle [the contract face value] from a senile old lady.").

This is not to say that Ms. Hamilton should escape punishment, but only that her punishment should be just.

### 2. Ms. Hamilton's Actions Subsequent to the Investigation Warrant a Sentence Below the Guidelines.

Ms. Hamilton's actions once the fraud was discovered show that she has tried to make right the wrongs she committed. Before plea negotiations began, Ms. Hamilton took control over SAC by shutting out Hr. Hedman and Company A's other employees and removing Mr. Dunkel's from the remaining NASA contract. Her actions followed discussions with the Government concerning how she intended to proceed and ensured that SAC's approximately 154 employees would not lose their jobs and employee benefits.

Furthermore, the Plea Agreement contains a forfeiture amount of greater than $1.2 million, which the parties agree is "the value of the proceeds of the defendant's offenses" and which Ms. Hamilton will be able to pay. Plea Agreement, ¶ 16. Finally, Ms. Hamilton has also consented to the SBA's proposed debarment further demonstrating her intention to pay the price of her actions.

## V.      AVOIDING UNWARRANTED DISPARITY – § 3553(a)(6)

The Court must also consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).  In considering other similar defendants, the Fourth Circuit has directed district courts to focus on the interests in national uniformity.  See *United States v. Pyles*, 482 F.3d 282, 290 (4th Cir. 2007) ("[T]he kind of 'disparity' with which § 3553(a)(6) is concerned is an unjustified difference across judges (or districts) rather than among defendants to a single case.") vacated on other grounds, 552 U.S. 1089 (2008) (vacating for consideration in light of *Gall v. United States*, 552 U.S. 38 (2007)).  Sentencing courts also consider the circumstances of other defendants sentenced within the same district.  See *United States v. Welch*, 290 F. App'x 543, 546 (4th Cir. 2008) (stating that the defendant "failed to establish that his sentence is disparate among the broader scope of similarly situated defendants").

In some instances, the Government does not criminally prosecute these kinds of cases. For example, a recent case in which two contractors falsely certified their companies as 8(a) and HUB Zone companies and received $12 million in Department of Defense contracts resulted in civil liability but no criminal charges.  See Exhibit 10.   (Anthony Wright/Platinum One Contracting & Vernon Smith/Capitol Contractors).  In another case, Audrey Price of Quantum Dynamic falsely certified that Quantum was located in a HUB Zone area to obtain, among others, a $40 million contract. Once again, there was civil liability but no criminal charges. See Exhibit 11.  (Audrey Price/Quantum Dynamic).

In one similar case that was prosecuted, the court imposed a sentence far below the guideline range in this case.  In *United States v. Blanchet*, No. 11-cr-324-VMC-TGW (M.D. Fla.), the United States sought a loss enhancement of either 24 levels (based on over $50 million

of contract value) or 20 levels (based on an estimated $11 million in diverted profits) as result of the defendant's fraudulent statements regarding eligibility for small business set-aside contracts. *Blanchet,* No. 11-cr-324, U.S. Sentencing Mem. at 8-11, Dkt. No. 164. The Court departed downward from the Guidelines, imposing a 36-month prison sentence. *Blanchet*, Judgment at 2, Dkt No. 170 (Blanchet) & 171 (codefendant Guillan). That 36-month sentence was imposed even though Blanchet, unlike Ms. Hamilton, did not accept responsibility, did not provide substantial assistance, and put the Government through trial.

On June 21, 2013, Judge Lee sentenced Keith Hamilton, the person the Government repeatedly described as the ringleader who recruited seven people into the conspiracy to 72 months imprisonment. Two other defendants were sentenced by Judge Brinkema on June 14, 2013 – David Lux (15 months) and Joseph Richards (27 months). Both sentences were far below the Government-recommended sentences (36 and 48 months, respectively – sentences well below the guidelines). During his sentencing hearing, Mr. Richards was described by the Government as Mr. Hedman's right-hand man who Mr. Hedman "sent from Company A over to [SAC] to act as the chief operating officer of that particular company during the course of the scheme." *United States v. Richard Lux*, No. 1:13cr76, Transcript of Sentencing Proceedings, June 14, 2013 at 5, 6. However, unlike Ms. Hamilton, the Government did not require Mr. Richards (or Messrs. Lux and Sanborn) to forfeit the salaries they earned while doing work for SAC. Mr. Richards received a salary of $165,000 a year from SAC in each of the two years he worked full time as chief operating officer. It is also clear from emails in which Mr. Richards discussed, among other things, transitioning management of Mr. Dunkel's subcontracting to John Hertogs; admonished Ms. Hamilton about keeping certain information "in-house"; organizing a meeting to discuss joint contracting services; instructing Ms. Hamilton, John Hertogs and others

22

with respect to the shifting of employees between Company A and SAC, that Mr. Richards exercised a significant amount of control over Ms. Hamilton and SAC well into 2011.  See Exhibit 12.

The need to avoid unwarranted disparity counsels strongly in favor of a prison sentence of 24-30 months.

## VI.    THE NEED FOR RESTITUTION – § 3553(a)(7)

There is no need to provide restitution to any victims of the offense in this case.  There are no individual victims who lost money or property as a result of the fraud.  As the PSR correctly states, "The victim in this case is the U.S. Government."  PSR, at ¶ 61.  The Government contends that restitution in the amount of $532,491.47, described as the amount of a "pass-through fee" related to contracts that co-defendant Michael Dunkel performed, is appropriate.  The Government and the PSR take the position that as a result of the subcontracting to Mr. Dunkel, NASA, the DoD, and DHS suffered a loss because SAC did not actually perform any work in exchange for this fee.

First and foremost, there is no factual basis for this claim.   As described in Ms. Hamilton's Objections to the PSR, SAC performed numerous general and administrative functions related to the five NASA contracts  and incurred the costs associated with administering those contracts for over six years.  These functions included reviewing the statements of work and deliverables for compliance, negotiating with equipment providers and suppliers, settling equipment and damage disputes, IT management, processing payroll, tax reporting and filing, financial accounting, providing timely payments to vendors, invoicing the client, receiving invoices from various consultants and vendors, verifying the hours being billed by consultants, verifying services SAC was billed for were properly performed and delivered on

time, allocating expenses to the appropriate contract to ensure proper billing and contract compliance.[6] Ms. Jonns' declaration simply fails to account for the value of any of these services in calculating the claimed pass through fees – contrary to Government-contracting regulations. See 48 C.F.R. § 31.203(d) (allowing "[a]ll items properly includable in an indirect cost base shall bear a pro rata share of indirect costs irrespective of their acceptance as Government contract costs").

Even assuming that the payments were a pass-through-fee, the Government's theory of loss is contrary to controlling Fourth Circuit case law. Although the parties agree that an offense listed in the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A, gave rise to the Plea Agreement, the Plea Agreement does not otherwise contain an agreed-upon restitution amount. Plea Agreement, Dkt. No. 5, at 9. Under the MVRA, "an order of restitution . . . shall be issued and enforced in accordance with section [18 U.S.C. §] 3664." 18 U.S.C. § 3663A(d). Section 3664(f)(1)(A) provides that "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." The Fourth Circuit has "interpreted this language to require that an order of restitution be based on 'actual loss,' rather than 'intended loss.'" *United*

---

[6] In 2010 and 2011, SAC received independent auditors reports from Dixon Hughes Goodman ("DHG"). In both years there were no adverse findings. Dixon Hughes Goodman reviewed SAC's accounting systems, labor rates, overhead, general and administrative fees. DHG was aware of who Dunkel was, and the system by which SAC handled the NASA invoicing, including SAC's administrative and management fee of 15% for labor and 10% for ODC's. DHG reported:

> "In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Security Assistance Corporation as of December 31, 2011, and the results of its operations and its cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America."

*States v. Harvey*, 532 F.3d 326, 339 (4th Cir. 2008) (citing *United States v. Adams*, 19 F. App'x 33 (4th Cir. 2001)); see *United States v. Squirrel*, 588 F.3d 207, 215 (4th Cir. 2009) (stating that "an order of restitution under the MVRA is to be based upon the loss directly and proximately caused by the defendant's offense conduct"); see also *Underwood v. United States*, No. 3:10-cv-784, 2012 WL 6082916, at *5 (E.D. Va. Dec. 6, 2012) (rejecting habeas petitioners' argument that "the loss amount should have been the same as the final restitution figure"); *United States v. Divine*, 724 F. Supp. 2d 590, 595-96 (W.D. Va. 2010) (holding that a contractual failure, without proof of actual losses, is not a basis for the district court to order restitution).

In *Harvey*, the Fourth Circuit reversed the district court's determination that the defendants' gain – as calculated pursuant to the sentencing guidelines – was an appropriate estimate of loss when determining the amount of restitution under the MVRA. *Harvey*, 532 F.3d at 340-41. The Court held that any order of restitution "must be based on sufficient evidence of the amount of actual loss incurred as a result of the fraudulently obtained contract. Profit gained by the defendants may not be used in its stead." *Id.* at 341. Similarly, in *Divine*, another court in this circuit determined restitution to the Government was not appropriate simply because the defendant used improperly trained employees. Because there was no evidence that the Government did not receive the level or quality of services it bargained for, a technical violation of the contract could not be used as a basis to award the Government restitution. *Divine*, 724 F. Supp. 2d at 596.

Here, the Government cannot identify any actual losses it suffered as a result of Ms. Hamilton's conduct. Fourth Circuit case law is clear that the defendant's gain – standing alone – cannot form the basis of a restitution order. The Government cannot demonstrate any actual losses it suffered as a result of the offenses because SAC fully performed all contracts it obtained

through the 8(a) program.  SAC consistently received excellent ratings and awards for its

performance of government contracts.  See Exhibit 13.  In particular, the performance

evaluations refer to how SAC performed "on time and on budget," "met or exceeded all contract

requirements," "displayed exceptional professionalism," and "exceeded all time frames

anticipated and/or required." *Id*. at 3, 6, 12, & 13.[7]  One evaluation noted that "SAC developed

and put in place a Quality Control program which exceeded the contract requirements in order to

ensure that they produced the best product possible, even beyond the contract requirements." *Id*.

at 14. As a result, any technical violations that may have occurred in Mr. Dunkel's performance

of the contracts, standing alone, do not justify a restitution order.

　　　　Furthermore, all available information demonstrates that the Government paid fair and

reasonable prices for the services SAC provided on the NASA contracts.  A February 28, 2013,

audit report of small business contracts by NASA's Office of the Inspector General ("NASA

OIG") found that "NASA had adequate controls in place to establish fair and reasonable contract

prices and oversee contractor performance." See Exhibit 14, at 7. The audit consisted of a review

of a "statistically selected sample of 20 small business awards." *Id*. The NASA OIG "reviewed

procurement files and performance assessments and surveyed both NASA procurement

personnel and product users." *Id*. at 8. The NASA OIG found "adequate controls were in place to

oversee performance, NASA and contractor personnel followed those controls, and contractors

met cost, schedule, and deliverable requirements." *Id*. The NASA OIG determined that "no

further review of additional awards to oversee contractor performance was warranted." *Id.* at 9.

Although the report does not identify the contracts reviewed, there is no reason to suspect SAC's

---

[7] These evaluations covered the U.S. Coast Guard contract, # Z339, which accounts for
approximately 57% of the total value of all contracts in the Statement of Facts. See Exhibit 29 at
1, 4 & 10.

performance of its NASA contracts was out of line from the audited sample. As applied to the

SAC contracts that Dunkel performed, year after year, contract after contract, task order after

task order, NASA continued to use Dunkel through SAC and pay the bargained-for contract

amount. As a factual matter, NASA received exactly what it paid for.[8]

Because there were no losses to the victim (the U.S. Government), restitution is not

appropriate in this case.

## VII.   FINE

Although the maximum statutory fine in this case is twice the amount of gain (over $12

million dollars), no separate fine is necessary in light of the agreed $1.2 million forfeiture and the

factors identified in 18 U.S.C. §§ 1031(e), 3553, and 3572.  Section 1031(e) requires:

> the court shall consider the factors set forth in 18 U.S.C. section 3553 and 3572, and the
> factors set forth in the guidelines and policy statements of the United States Sentencing
> Commission, including – (1) the need to reflect the seriousness of the offense, including
> the harm or loss to the victim and the gain to the defendant; (2) whether the defendant
> previously has been fined for a similar offense; and (3) any other pertinent equitable
> considerations.

In determining the imposition and amount of a fine under § 3572(a), the Court must

consider, among other things, the income, financial resources, earning capacity of the defendant,

any pecuniary harm inflicted upon others, whether restitution is ordered, the need to deprive the

defendant of illegally obtained gains from the offense, and the expected costs to the government

of any imprisonment, supervised released, or probation component of the sentence. 18 U.S.C. §

---

[8] In reality, NASA received considerably more than it paid for because it has refused to pay
SAC's last two invoices for $37,171.37 (Task Order NNC09CA39C 8R) and $39,436.61 (Task
Order NNC11TB04T) due to the fraud.  See Exhibit 15.  In addition to these invoices, SAC paid
Other Direct Costs ("ODCs") on Task Order NNC11TB04T in the amount of $17,848.54 that
SAC did not submit to NASA for payment after it refused payment on the two unpaid invoices.
See Exhibit 16.  To the extent that any restitution may be owned, that amount should be reduced
by $94,456.52 – the amount of the windfall NASA received, which includes $50,422.86 in
ODCs that SAC paid to third-party vendors.  See Exhibit 17.

3572(a)(1)-(6); see also *United States v. Crawford*, 477 F. App'x 29, 30 (4th Cir. 2012); *United States v. Castner*, 50 F.3d 1267, 1277 (4th Cir. 1995); USSG § 5E1.2.

In applying these factors, no additional fine is necessary. First, Ms. Hamilton has agreed to forfeit more than $1.2 million on which she has paid taxes. Second, even though Ms. Hamilton has sufficient assets to pay a reasonable fine, her financial situation is far less favorable than the PSR suggests. The PSR states that Ms. Hamilton has a net monthly cash flow of $75,483 which includes an average of $75,000.00 in corporate distributions based on her 2012 distribution. Ms. Hamilton has not taken a single distribution in 2013. Since the beginning of 2013, Ms. Hamilton has deposited $500,000.00 into the undersigned's escrow account which she has directed be used to pay any additional forfeiture and/or False Claims Act damages being sought by the Government. Once she closes SAC, she will have no other source of income. Her future earning capacity after she is released from prison will also be substantially limited as a result of her guilty plea. Throughout the last ten years of Ms. Hamilton's career, she has worked almost exclusively in government contracting positions. Her guilty plea in this case will almost assuredly prevent her from working in any similar jobs in the future.

Third, the Guidelines call for a maximum fine of $100,000 (if the offense level is 25) or $125,000 (if the offense level is 27) or $150,000 . See U.S.S.G. § 5E1.2(c)(3). Because there was no pecuniary harm to the victim (U.S. Government) in this case, and all illegal gains will be repaid to the Government, a fine is unnecessary in this case. [9]

---

[9] Mr. Hedman has already paid $1,573,026.09 of his total $6.1 million forfeiture. He has also placed the difference between that amount and $6.1 million in an escrow account. He has asked the Court to be allowed to withdraw amounts equal to the portions of the forfeiture amount paid by the other defendants. Mr. Hedman has also agreed to pay any amount remaining in the escrow account after two years to the Government. *United States v. Keith Hedman*, No. 1:13cr74, Def. Sentencing Memo, Dkt. 17 at 39.

Finally, as previously mentioned, after Ms. Hamilton entered her guilty plea, she received notice that the Government intends to pursue additional financial penalties and damages under the False Claims Act ("FCA").  See Exhibit 18 (Letter from AUSA P. Hyun).   The prosecution has also advised Ms. Hamilton that the United States Attorney's Office will seek a criminal indictment against SAC unless agreement is reached on payment of an additional forfeiture.  The United States has rejected Ms. Hamilton's substantial offer to pay an additional $1.2 million to the Government to resolve these potential liabilities.

Given these circumstances, including the fact that all of the all of the illegally obtained profits will be returned to the Government, the imposition of a fine is unnecessary.[10]

## VIII.   THE PURPOSES OF SENTENCING – § 3553(a)(2)

Section 3553(a)(2) requires that the sentence imposed reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, and provide the defendant with needed rehabilitation.  18 U.S.C. § 3553(a)(2)(A).  A sentence of 24 to 30 months that includes the $1.2 million forfeiture, and a recommendation for the 500 hour Residential Drug Abuse Program ("RDAP") will accomplish each of these goals.   Furthermore, "respect for the law" does not automatically require a harsher punishment.   Respect for the law must be read in its broadest sense – including avoiding unduly harsh punishment when the offense and the individual defendant do not deserve it.  Finally, providing just punishment must take into account Dawn Hamilton's life up to this point.

A sentence of between 24 and 30 months imprisonment and a $1.2 forfeiture will also achieve ample deterrence.   As one court has observed, "there is [] considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar'

---

[10] Judge Lee imposed a $15,000 fine in Mr. Hedman's case.

offenders." *United States v. Adelson*, 441 F. Supp. 2d 506, 514 (S.D.N.Y 2006) (citing *inter alia* United States Sentencing Commission, *Fifteen Years of Guidelines Sentencing* 56 (2004) (noting that the sentencing guidelines were written, in part, to "ensure a *short but definite period of confinement* for a larger proportion of these 'white collar' cases, both to ensure proportionate punishment and to achieve deterrence") (emphasis added)).   Persons viewing this case will see that for a crime that provided Ms. Hamilton with $1.2 million, she will have lost ownership of a company that employs 154 people and provided her family with financial security for the first time in her life.   She has lost her hard won reputation and the ability to work in the field of government contracting.   Most importantly, she will spend years separated from her children and loved ones, and from the many others who have depended on her to maintain their sobriety. A sentence of 24 to 30 months imprisonment for a woman with Ms. Hamilton's background would send a strong message to the government contracting community that people should not engage in this kind of conduct.

Finally, as to protecting the public from further crimes of the defendant – the proposed sentence is more than sufficient.   Ms. Hamilton has accepted voluntary debarment.   Her own actions have eliminated her ability to engage is similar conduct or any major business activity for the foreseeable future.   The goodwill and value that Ms. Hamilton has built in SAC over the last 17 months will disappear.   Most importantly, she will be sending her children out into the world without the mother on whom they so heavily depend.

## CONCLUSION

Sentencing courts have wrestled with the elements that make up just punishment. As one noted district court judge has commented:

> if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his

sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant."

*Adelson*, 441 F. Supp. 2d at 513-14 (Rakoff, J.).  This principle applies here with special force where Ms. Hamilton has fought so long and come so far.   In the context of her overall life, a sentence of between 24 and 30 month is "sufficient but not greater than necessary" to achieve the goals of sentencing.

Respectfully submitted,

DAWN LEE HAMILTON
By Counsel

/s/_____
Nina J. Ginsberg, Esquire
VSB # 19472
*Counsel for Dawn Lee Hamilton*
DiMuroGinsberg, P.C.
1101 King Street, Suite 610
Alexandria, VA 22314
Phone: 703-684-4333
Fax:     703-548-3181
nginsberg@dimuro.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 25th day of June, 2013, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following counsel of record:

Ryan Scott Faulconer
US Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
703-299-3700
ryan.faulconer2@usdoj.gov

Chad I. Golder
US Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
703-299-3700
chad.i.golder@usdoj.gov

I further certify that I will send an electronic copy to the below non-filing user:

Carla G. Coopwood
Senior U.S. Probation Officer
Carla_Coopwood@vaep.uscourts.gov

/s/ _____
Nina J. Ginsberg, Esquire
VSB # 19472
*Counsel for Dawn Lee Hamilton*
DiMuroGinsberg, P.C.
1101 King Street, Suite 610
Alexandria, VA 22314
Phone: 703-684-4333
Fax:    703-548-3181
nginsberg@dimuro.com

32